776 So.2d 723 (2000)
Antonio HARDIMAN a/k/a Antonio G. Hardiman a/k/a Antonio Gus Hardiman a/k/a `Twon', Appellant,
v.
STATE of Mississippi, Appellee.
No. 1999-KA-00298-COA.
Court of Appeals of Mississippi.
October 17, 2000.
Rehearing Denied January 30, 2001.
*724 B. Leon Johnson, Harvey Christopher Freelon, Jackson, Attorneys for Appellant.
Office of the Attorney General by Billy L. Gore, Attorney for Appellee.
BEFORE SOUTHWICK, P.J., IRVING, AND PAYNE, JJ.
IRVING, J., for the Court:
¶ 1. Antonio Hardiman was tried and convicted on a two count indictment for vehicular homicide and aggravated driving while under the influence of alcohol. He was sentenced to serve a term of twenty years on count one and a term of twenty-five years on count two, sentences to run consecutively. Hardiman prosecutes this appeal from the denial of his motion for JNOV, or in the alternative for a new trial. He raises four issues on appeal. Those issues, taken verbatim from his brief, are:
I. The trial court erred in not granting the defendant a continuance to obtain medical records and expert medical advice.
II. The trial court erred in not issuing an order to compel release, prior to trial, of the medical records pertaining to Eric Golliday.
III. The trial court erred in not allowing the defendant time to retain an *725 expert to explain the nature of the injuries suffered by Eric Golliday in the motor vehicle accident.
IV. The trial court erred in refusing the defendant's motion for a mistrial when the jury, after deliberating nearly six (6) hours, sent a note to the trial judge indicating it could not reach a decision.

FACTS
¶ 2. The facts, according to the State's case, showed that Megan Anthony was killed when an automobile driven by Hardiman veered into the wrong lane of travel and collided with an automobile driven by Megan's mother, Donna Anthony. Donna Anthony's oldest daughter, Brandi Anthony, and Brandi's boyfriend, Trinity Hardin, were also passengers in the Anthony vehicle. Trinity suffered severe facial injuries that required facial surgery and resulted in scarring and some impairment of his senses of sight and smell.
¶ 3. Eric Golliday and Bobby Willis were riding in the car with Hardiman at the time of the collision. Golliday and Willis both testified that Hardiman was drinking and driving at the time of the fatal accident. Golliday testified that he was seated in the front passenger seat, and Willis was seated on the driver's side in the rear. Both Golliday and Willis testified that Golliday was asked by James Meeks to drive Hardiman home in Meeks's car, and to then return the car to Meeks. Each of them also testified that Hardiman insisted on driving after Golliday seated himself in the driver's seat and prepared to drive.
¶ 4. It was Golliday's and Willis's testimony that Hardiman was in a hurry to get home and insisted that he knew the shortest and most direct route, and that it was only then that Golliday moved out of the driver's seat and allowed Hardiman to drive. Golliday and Willis testified that during the drive Hardiman was speeding and driving recklessly, and at one point drank from a bottle of alcohol that he had with him. Golliday and Willis both testified that they each pleaded with Hardiman to slow down prior to the collision.
¶ 5. At some point shortly after the collision, Hardiman exited the vehicle and left the accident scene. He was later found and arrested at his home. After his arrest he was taken to a hospital where a blood sample was drawn. Hardiman testified at trial that he left the scene of the accident to call 911. There was no phone record of Hardiman having placed a call to 911 on the evening of the accident. Hardiman's blood-alcohol level was .14 several hours after the accident.
¶ 6. The arresting officer, Deputy Denley, testified that after the accident Hardiman admitted to Denley that he was driving the automobile. According to Denley's testimony, "He [Hardiman]was very clear about the fact. In fact, he asked me how the child that was involved in the wreck was doing." Denley testified that initially Hardiman made several statements in which he admitted being the driver of the automobile at the time of the accident and even agreed to give a taped statement to that effect. However, when Hardiman was asked if he was the driver during a tape recorded statement, he denied being the driver. Hardiman denied that he was driving the car when the fatal collision occurred.
¶ 7. Hardiman's sole defense at trial was that Eric Golliday was driving the vehicle at the time of the accident. Prior to trial, Hardiman filed an application for subpoena duces tecum to discover Golliday's medical records. At the hearing on Hardiman's motion, the trial judge asked Golliday to voluntarily waive his privilege of confidentiality with regards to his medical records. Golliday refused, and the court declined to order the records released over Golliday's objection.
¶ 8. Hardiman was allowed to examine Golliday's medical records, in camera, on the morning of his trial. Golliday's medical records contained contradictory statements by the treating physician regarding *726 whether Golliday was the driver or passenger. There were also notations about chest and abdominal pain which Hardiman claimed may have been consistent with someone getting hit by the steering wheel while driving a vehicle. Hardiman moved for a continuance in order to further explore these aspects of Golliday's medical records. The motion was denied, and the case proceeded to trial.
¶ 9. Hardiman produced five witnesses who testified in his behalf. Two of the five witnesses were individuals who were at the scene when Hardiman and his riders departed Meeks's place. One of the individuals was Meeks's girlfriend. She testified that Meeks had solicited Golliday to drive Hardiman home because Hardiman was too intoxicated to drive himself. The other individual was a young woman Hardiman tried to persuade to accompany him home. Both of these females testified that Golliday was behind the wheel on the last occasion that they remembered seeing the vehicle, but neither could say for certain who was driving when the car actually departed.
¶ 10. Another female witness testified that she was pregnant with Hardiman's child at the time of the accident. She also claimed that on the day following the accident she was part of a conversation with Golliday and Willis in which she heard Golliday say that he was driving at the time of the crash, but that he was not going to take the blame.
¶ 11. The State produced Bobby Willis in rebuttal. Willis refuted the testimony of Hardiman's pregnant girlfriend and testified that the pregnant girlfriend had actually tried to convince Golliday to admit to being the driver because she did not want her baby to grow up without a father.
¶ 12. At the close of all the evidence, Hardiman's request for peremptory instruction was denied. The jury retired to deliberate at 2:48 p.m., and at 3:33 p.m. submitted several written questions to the circuit judge.
BY THE COURT: Go on the record and state that the court received a request from the jury stating that they wanted the testimony of Sherry Blanch, the testimony of Eric Golliday and Mr. Willis in regards to vehicles avoiding on country road and Willis Road. They also ask a question: Why was Antonio in such a hurry to get home? And we would like the dispatcher sheets. And I'm writing them a note back saying: The information and testimony that you have requested is not available. You will have to base your verdict on the testimony and evidence that was presented in open court.
¶ 13. At 5:24 p.m. the jury submitted another question to the court and requested drinks and snacks:
BY THE COURT: The court has before it a note from the jury which states: May we have someone to read the testimony given per Ariel in regards as to her returning to quote, the house or going to the car? P.S. We need drinks and snacks, please. So I wouldof course, the answer is: No, that testimony is not available to be read back to them. And that's how I'm going to respond. And yes, we will get you food and drinks.
¶ 14. At 7:02 p.m. the jurors indicated they were deadlocked and could not reach a verdict. The trial judge thereafter gave the so-called Sharplin instruction, and the jury resumed its deliberations. Hardiman made a motion for a mistrial. The motion was overruled. At 8:33 p.m. a juror needed medication from home, and at 8:45 p.m. the jury submitted another question to the court:
BY THE COURT: Court will come back to order. I'll state I've got another note from the jury. It reads: Can we havewe have a question of can we have a hang [sic] jury? And I'm going to send them a note back advising them to please reread Instruction No. 10, which is the Sharplin instruction.
*727 ¶ 15. After the trial judge instructed the jury to reread the Sharplin instruction, the defendant's second motion for a mistrial was overruled. At 10:45 p.m., approximately eight hours after it began its deliberations, the jury returned with separate verdicts of guilty of manslaughter and guilty of aggravated driving under the influence. A poll of the jury reflected the verdicts returned were unanimous.

Analysis of Issues Presented

I. Did the trial court err: (a) in not compelling the pretrial release of Golliday's medical records, (b) in not granting a continuance, and (c) in not allowing time for retention of a medical expert?
¶ 16. Since Hardiman's first three issues are all interrelated, they will be discussed together. The crux of Hardiman's complaint appears to be that he should have been able to examine Eric Golliday's emergency room records prior to the morning of trial. Since he was not allowed to do so, he contends that a continuance should have been granted in order to allow him time to retain an expert to explain the nature of the injuries Golliday received in the accident, and to interview the emergency room physicians who treated Golliday. Hardiman contends that the court's refusal to grant him a continuance was highly prejudicial to his defense.[1]
¶ 17. Hardiman filed a motion for new trial. At the hearing on the motion, Hardiman presented no affidavits or proposed testimony from Golliday's physicians, nor did he present any evidence that he had conferred with any expert of his own choosing who would offer any relevant testimony supporting the need for a continuance. Hardiman's counsel merely made the same arguments at the hearing on his motion for a new trial that were made at the pre-trial hearing on his motion for a continuance.
¶ 18. There was nearly a full month between the filing of Hardiman's motion for a new trial and the time that the hearing was conducted. It appears to this Court that Hardiman had sufficient time to consult with an expert concerning Golliday's medical record. It seems that Hardiman also could have conferred with Golliday's physicians and if they had refused to talk with him because of the physician client privilege, that fact could have been presented to the court by way of affidavit in support of his motion for new trial.
¶ 19. Under this Court's standard of review the granting of a continuance is largely within the sound discretion of the trial court, and a judgment will not be reversed because the continuance is refused unless there has been an abuse of sound discretion. Woodruff v. State, 220 Miss. 24, 27, 70 So.2d 58, 59 (1954); Gatlin v. State, 219 Miss. 167, 172, 68 So.2d 291, 292 (1953). Also, the refusal of a motion for a continuance on the ground of the absence of a witness will not be overturned on a motion for a new trial unless the witness, or his affidavit showing what his testimony would be, is offered on the hearing of the motion, or it is shown that it was impossible or impracticable to secure the attendance of the witness or to secure his affidavit. Robertson v. State, 157 Miss. 642, 644, 128 So. 772, 773 (1930).
¶ 20. As stated previously, Hardiman offered no proof by way of witnesses or affidavits in support of his motion for a new trial, nor did he show that it was impossible or impracticable to secure the attendance of the witness or to secure his affidavit. In order to obtain a favorable ruling on the motion for new trial on the continuance issue it was necessary for the trial court, and this Court on appeal, to know what the attending physicians or any other expert would have said with regard to the treatment of Golliday and the nature of his injuries. Accordingly, under *728 the circumstances of this case, no abuse of discretion can be attributed to the trial court in denying the continuance and motion for new trial.

II. Did the trial court err in refusing Hardiman's motion for a mistrial when the jury sent a note to the trial judge indicating it could not reach a decision after deliberating nearly six hours?
¶ 21. Hardiman argues, on the basis of Isom v. State, 481 So.2d 820 (Miss. 1985), that eight hours is suggestive of excessive deliberation time. He argues further that since the jury stated it was deadlocked on two different occasions, the trial court should have declared a mistrial on the second notice of a deadlock, rather than instructing the jury to keep deliberating.
¶ 22. The jury retired to deliberate at 2:48 p.m. At approximately 7:02 p.m. the jury indicated it could not reach a verdict. The trial judge elected to give the Sharplin instruction as follows:
Ladies and gentlemen, I know that it's possible for honest men and women to have honest differences of opinions about the facts of the case. But if it is possible to reconcile your differences of opinion and decide this case, then you should do so.
Accordingly, I remind you that the court originally instructed you that the verdict of the jury must represent the considered judgment of each juror. It is your duty as jurors to consult with one another and to deliberate in view of reaching an agreement if you can do so without violence to your individual judgment.
Each of you must decide the case for yourself, but do so only after an impartial consideration with your fellow jurors.
In the course of your deliberations, do not hesitate to reexamine your views and change your opinion if you are convinced that it is erroneous, but do not surrender your honest convictions to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.
And please continue your deliberations. And if at some point during your deliberations, if you wish to recess for the evening and resume deliberations in the morning, then please notify the court. And here is this additional instruction.
Hardiman objected to the giving of the instruction and made a motion for a mistrial. His motion was overruled.
¶ 23. At 8:45 p.m. the jury sent the court a note asking if it could be a hung jury. The trial judge answered with written instructions to the jury to reread the instruction set forth previously. Hardiman again objected to the continuation of deliberations and made another motion for a mistrial. In response, the judge stated:
BY THE COURT: The court is not prepared to declare a mistrial until I hear something further from the jury. And of course, the court instructed them back at about 7:00 o'clock that any time they got ready to recess for the evening, to notify the court. So the courtand sent that to them in writing.
So I'm fully aware ofor I feel like the jury is fully aware of their options in that regard. So until they tell me that they want to resume deliberations in the morning, I'm going to allow them to continue to deliberate.
At 10:45 p.m. the jury returned its dual verdicts of guilty.
¶ 24. "It is within the sound discretion of the trial judge as to how long he will keep the jury in deliberation, and this discretion will not be reviewed [sic] on appeal unless there has been a clear abuse of discretion." Dixon v. State, 306 So.2d 302, 304 (Miss.1975) (quoting Gordon v. State, 149 So.2d 475, 477 (Miss.1963)). If a trial judge feels that there is a possibility that a jury might reach a verdict, he may return the jury for further deliberations by simply stating to the jury to please continue *729 its deliberations or he may give the Sharplin instruction. Brantley v. State, 610 So.2d 1139, 1142 (Miss.1992). The Mississippi Supreme Court has approved the Sharplin instruction and has held that it may be given in either criminal or civil cases when the trial judge is confronted with a hung jury. Id.
¶ 25. Since there is no "bright line rule" as to when a trial judge should grant a continuance or recess, our analysis necessarily then focuses upon the unique facts of each case. Hooker v. State, 716 So.2d 1104 (¶ 14) (Miss.1998). As stated previously, to support his position that the trial judge abused his discretion in allowing the jury to continue to deliberate, Hardiman cites Isom v. State, 481 So.2d 820 (Miss. 1985).
¶ 26. In Isom, after a day and a half of hearing the defendant's murder case, the jury deliberated from 3:21 p.m. until 10:38 p.m. without reaching a verdict. Three of the jurors expressed their desire to recess deliberations at that time. Nonetheless, the trial court sent the jury back for further deliberations, and at 11:35 p.m., the jury finally reached a verdict of manslaughter. On appeal, the Mississippi Supreme Court held that seven hours of jury deliberation under the facts of that particular case was excessive, where the length of the trial was relatively short as opposed to the length of deliberations, and where several jurors expressed a desire to begin deliberations anew the next day. Isom, 481 So.2d at 824.
¶ 27. The distinction between the case at bar and Isom is clear. The trial of this case lasted three days, twice the length of the trial in Isom, and the jury deliberated for approximately eight hours, about the same length of time as in Isom. None of the jurors expressed a desire to recess deliberations at any time before reaching a verdict. Consequently, under the facts and circumstances of the case at bar, we find that the trial judge acted well within his judicial discretion in allowing the jury to continue to deliberate.
¶ 28. THE JUDGMENT OF THE CIRCUIT COURT OF GRENADA COUNTY OF CONVICTION OF COUNT I OF MANSLAUGHTER AND COUNT II OF AGGRAVATED DRIVING UNDER THE INFLUENCE OF ALCOHOL AND SENTENCE TO SERVE A TERM OF TWENTY YEARS ON COUNT ONE AND TO SERVE A TERM OF TWENTY-FIVE YEARS ON COUNT TWO, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS TO RUN CONSECUTIVELY TO COUNT ONE AND TO RUN CONSECUTIVELY TO ANY SENTENCE PREVIOUSLY IMPOSED IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO GRENADA COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, LEE, MOORE, MYERS, PAYNE, AND THOMAS, JJ., CONCUR.
NOTES
[1] It should be pointed out that even though the trial court denied the motion for a continuance Hardiman, nevertheless, was allowed to introduce Golliday's medical record into evidence, and extensively cross-examine Golliday about its contents.