841 So.2d 170 (2003)
Harvey Clifton THORNTON, Appellant,
v.
STATE of Mississippi, Appellee.
No. 2001-KA-01262-COA.
Court of Appeals of Mississippi.
February 18, 2003.
*171 Jim Davis, Moss Point, attorney for appellant.
Office of the Attorney General, by Scott Stuart, attorney for appellee.
Before THOMAS, P.J., IRVING and MYERS, JJ.
IRVING, J., for the court.
¶ 1. Harvey Clifton Thornton (Thornton) was convicted by a jury, sitting for the Circuit Court of Harrison County, for the manslaughter of his brother, Shelton Gerald Thornton. The trial judge sentenced him to serve a term of twenty years in the custody of the Mississippi Department of Corrections. Thornton has appealed, asserting the following issues: (1) whether the admission of the tape of Addie Thornton's statement to law enforcement was error, and (2) whether the court erred by rereading the Sharplin instruction to the jury, highlighting the elements of the instruction, and granting the State's additional instruction.
¶ 2. This Court finds no error in the admission into evidence of the statement given by Thornton's mother, but even if it were, it was harmless error beyond doubt. Further, this Court finds no error in the lower court's giving of the second instruction on voluntary intoxication or its rereading of the Sharplin instruction under the circumstances of this case. We therefore affirm the judgment of the trial court.

FACTS
¶ 3. On March 11, 2000, Thornton, along with his other siblings, Shelton and Daniel, accompanied his elderly mother, Addie Thornton, from the hospital to her home after their father had suffered a stroke. Earlier in the day, Thornton and Mrs. Thornton went to the hospital to see Thornton's father. Thornton had been drinking rum that morning and brought rum with him in a quart jug to the hospital. That afternoon, the two left the hospital, *172 stopped at a grocery store, and bought chicken and beer. Thornton also bought a gallon of rum and a large bottle of wine for his mother and his brothers, Shelton and Daniel.
¶ 4. After Thornton and his mother arrived back at the Thornton home, Thornton was still drinking rum. Thornton had also been taking different medications throughout the day. Thornton and Shelton had smoked marijuana. Mrs. Thornton and Daniel had some wine.
¶ 5. After cutting grass outside the Thornton home, Shelton came into the house. He sat on a couch next to Daniel who was watching television. Thornton later came inside and asked Shelton why Shelton had had sexual intercourse with Thornton's wife. Shelton responded that he had sexual intercourse with her before, during and after she and Thornton were married. This was stated in somewhat of a laughing manner.[1]
¶ 6. Thornton immediately proceeded to the laundry room to retrieve his gun, which was already loaded. When Thornton appeared with the gun, his mother got up and grabbed it. According to her recorded statement, she was able to wrestle it away from him on two occasions. However, Thornton got the gun a third time. His mother grabbed it again and knocked it up. Thornton snatched the gun out of her hand, told Shelton that Thornton was going to kill his a-s, and fired the fatal shot. Daniel attempted to stop Shelton's bleeding, and Thornton called 911. The Long Beach police arrested Thornton at the scene.
¶ 7. Thornton was indicted for murder by a grand jury for his brother's death. Following two days of trial, the jury found Thornton guilty of manslaughter, and he was sentenced to serve twenty years in the custody of the Mississippi Department of Corrections. Thornton's post-trial motions were denied, and this appeal ensued.

ANALYSIS AND DISCUSSION OF THE ISSUES
1. The Admission of the Addie Thornton's Tape-recorded Statement
¶ 8. The appellate court's standard of review of a trial court's admission or exclusion of evidence is the abuse of discretion standard. Herring v. Poirrier, 797 So.2d 797, 804 (¶ 18) (Miss.2000). The trial judge is empowered with the discretion to consider and to decide what evidence is admissible, and unless this judicial discretion is so abused as to be prejudicial to the accused, then, the ruling of the lower court must be affirmed. Francis v. State, 791 So.2d 904, 907 (¶ 7) (Miss.Ct. App.2001) (citing Graves v. State, 492 So.2d 562, 565 (Miss.1986); Shearer v. State, 423 So.2d 824, 826 (Miss.1982)).
¶ 9. On the day that Shelton was killed, Mrs. Thornton gave a recorded statement to Lieutenant Mike Byrd of the Long Beach Police Department concerning the shooting incident. On March 21, 2000, ten days after the shooting, Mrs. Thornton gave a recorded statement to Detective Susan Taylor of the Long Beach Police Department. Detective Taylor testified for the prosecution, while Lieutenant Byrd was called as a witness by the defense.
¶ 10. Due to Mrs. Thornton's mental condition at the time of trial (she had been diagnosed with dementia and major depression), the trial judge ruled that she was unavailable as a witness. Consequently, the recorded statement given to *173 Detective Taylor was admitted into evidence under the "Other Exceptions" provision of M.R.E. 804(b)(5) which reads:
A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will be best served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.
¶ 11. Thornton argues that the court erred by admitting the tape of Addie Thornton's statement. He claims the State failed to prove that the statement contained the "particularized guarantees of trustworthiness" required for out-of-court statements which fit into a "firmly-rooted hearsay exception." He contends that because of Mrs. Thornton's mental condition and her motive to fabricate, her statement fails the test for trustworthiness. Consequently, he explains that this failure violates his right to confront adverse witnesses. Further, Thornton claims that the admission of the tape was not harmless error because the tape refuted his defense that he had killed his brother by accident.
¶ 12. In reaching its decision to allow Mrs. Thornton's statement into evidence, the trial court found that Mrs. Thornton was able to give an accurate statement in March of 2000. The court further found that, under Idaho v. Wright, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), it was required to find in the tape a "particularized guarantee of trustworthiness." In the trial court's opinion, Mrs. Thornton's statement was reliable because she was "an eyewitness ... and there's no reason to indicate or believe that she would be harboring any prejudice or any ill will against one son or the other."
¶ 13. We agree with the trial court that there's no reason to indicate or believe that Mrs. Thornton would harbor any prejudice or any ill will against one son or the other. Also, we reject Thornton's argument that Mrs. Thornton had a motive to lie and that her statement was self-exculpatory.
¶ 14. Mrs. Thornton's first recorded statement (the one given to Officer Mike Byrd) was not introduced into evidence; however, Officer Mike Byrd testified regarding it as follows:
Q: Do you recall if Addie Thornton ever told you that she put her hands on the gun?
A: At one point in time, yes, she did.
Q: In fact at one point in time did she tell you she had her hands on the gun when it was shot?
A: No, sir, she did not.
Q: When did she tell you she had her hands on the gun?
A: Through the course of the interview, I specifically asked her once we got to that point whether or not she actually had her hands on the weapon when it went off. She specifically told me on three separate occasion[s], no, that she did not.
Q: She didn't tell you at first she did and subsequent later change on and say she didn't?
*174 A: No, sir. To the best of my recollection, when we specifically talked about the weapon, she said that she tried to grab it out of his hands, and that when she did, the defendant pulled the weapon away from her and then pointed the weapon at his brother. But at the specific time the weapon went off, she did not have physical contact, and I reiterated that three times separately to make sure that she was clear on that issue.
Q: In fact did she tell you, no, I'm not going to be accused of that?
A: To some extent I do remember that, yes, sir.
¶ 15. Thornton argues that Mrs. Thornton could not bear the idea or notion that she may have had a hand in causing her son's death. Hence, he makes the subtle argument that her exclamation that "I'm not going to be accused of that" during her interview with Byrd demonstrates that her statement was both self-serving and self-exculpatory.
¶ 16. We note from Officer Byrd's testimony that he apparently questioned Mrs. Thornton extensively about the location of her hands vis-avis the gun at the time the gun discharged. In light of his persistence in this regard, it is quite understandable that Mrs. Thornton would be emphatic with him. Further, we have listened to both the unedited and redacted versions of her first recorded statement, as well as the second statement which was given to Detective Taylor, and we are satisfied that both of her statements are consistent and do not indicate in the least any concern on her part that she may have had some complicity in Shelton's death.
¶ 17. Even if we were to agree that it was error to admit Mrs. Thornton's statement, we would be obliged to find such error harmless. A violation of the Confrontation Clause can be subjected to harmless error review. Rogers v. State, 796 So.2d 1022, 1028 (¶ 19) (Miss.2001) (citing Earl v. State, 672 So.2d 1240, 1243 (Miss.1996); Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). When error involves the admission or exclusion of evidence, we, sitting as an appellate court, will not reverse unless the error adversely affects a substantial right of a party. Stallworth v. State, 797 So.2d 905, 908 (¶ 8) (Miss.2001) (citing In re Estate of Mask, 703 So.2d 852, 859 (¶ 34) (Miss.1997); Terrain Enters., Inc. v. Mockbee, 654 So.2d 1122, 1131 (Miss. 1995)).
¶ 18. Here, a plethora of evidence proves convincingly that Thornton's conviction was proper. Officer Bryan Young gave an accurate depiction of the crime scene, the state of the victim, the gun and ammunition used, the presence and identification of alcohol, and his videotape of the crime scene. On two separate occasions, Officer Daisy Morales and Detective Roland Flowers each testified that Thornton, after being given his Miranda rights, admitted that he killed his brother for "f____g Thornton's wife." The recording of the conversation between Thornton and the 911 dispatcher also clearly implicates Thornton's motive for killing his brother Shelton. Thornton called 911 and told the dispatcher that he had shot his brother in the chest with a gun. When the dispatcher asked him why he had shot Shelton, Thornton told the dispatcher he had shot him because Shelton had had a sexual relationship with Thornton's wife. Additionally, Daniel gave corroborating testimony concerning (1) the conversation between Thornton and Shelton about Shelton's affair with Thornton's wife, (2) Thornton's retrieval of the murder weapon, and (3) the actual shooting of Shelton by Thornton.
*175 ¶ 19. This Court finds that the lower court's admission of Mrs. Thornton's statement into evidence was proper, but even if we were to hold to the contrary, the evidence, as previously recounted, would inevitably lead us to the conclusion that the error would be harmless.
2. The Sharplin Instruction
¶ 20. After five hours of deliberations, the jury had been unable to agree on a verdict. The trial judge summoned them to the courtroom and read the Sharplin[2] instruction to them. The judge then sent the jury back for further deliberations. After three more hours of deliberations, the jury sent the judge a written note which stated, "[p]lease clarify why intoxication can't be used as a defense, but in your given definition of manslaughter, the phrase `drunken stooper' is used as a factor."
¶ 21. Before deciding on a course of action, the judge entertained argument from both the prosecution and defense about whether an additional instruction should be given concerning intoxication and whether the Sharplin instruction should be reread. After the attorneys for both sides had given their views on the issue, the judge gave a supplemental intoxication instruction, reread the Sharplin instruction, and reread the instructions concerning the elements of murder and manslaughter. The judge also advised the jury to notify the court in writing whenever it was ready to retire or recess for the evening.
¶ 22. An hour and a half later, the jury returned with a unanimous verdict of guilty of manslaughter.
¶ 23. Thornton argues that the trial court erred when it reread the Sharplin instruction. According to him, "rereading the Sharplin instruction had a coercive effect on the jury which is prohibited by Isom v. State, 481 So.2d 820 (Miss.1985)."
¶ 24. In Sharplin v. State, 330 So.2d 591, 596 (Miss.1976), the Mississippi Supreme Court authorized the giving of the following instruction when the trial judge is confronted with the possibility of a hung jury:
I know it is possible for honest men and women to have honest different opinions about the facts of a case, but, if it is possible to reconcile your differences of opinion and decide this case, then you should do so.
Accordingly, I remind you that the court originally instructed you that the verdict of the jury must represent the considered judgment of each juror. It is your duty as jurors to consult with one another and to deliberate in view of reaching agreement if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if you are convinced it is erroneous, but do not surrender your honest convictions as to the effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. Please continue your deliberations.
¶ 25. If a trial judge feels that there is a possibility that a jury might reach a verdict, he may return the jury for *176 further deliberations by simply stating to the jury to please continue its deliberations or he may give the Sharplin instruction. Hardiman v. State, 776 So.2d 723, 729 (¶ 24) (Miss.Ct.App.2000) (citing Brantley v. State, 610 So.2d 1139, 1142 (Miss.1992)).
¶ 26. In Hardiman, the defendant was charged with vehicular homicide and aggravated driving while under the influence of alcohol. Hardiman, 776 So.2d at 724 (¶ 1). At the close of all the evidence, the jury deliberated approximately four and a half hours before indicating they were deadlocked and could not reach a verdict. The trial judge thereafter gave the Sharplin instruction, and the jury resumed its jury deliberations. Id. at 726 (¶¶ 12 & 14). After deliberating approximately two hours and forty-five minutes longer, the jury sent to the court a note which read, "[c]an we have-we have a question of can we have a hang [sic] jury?" Id. at 726 (¶ 14). The trial judge instructed the jury to reread the Sharplin instruction. Two hours later, approximately eight hours after it began its deliberations, the jury returned with separate verdicts of guilty of manslaughter and guilty of aggravated driving under the influence. A poll of the jury reflected the verdicts returned were unanimous. Id. at 727 (¶ 15).
¶ 27. We find the facts of the case-at-bar to be very similar to Hardiman. Like Hardiman, the jury deliberated approximately the same length of time, the court gave the Sharplin instruction twice, the jury never requested to retire or recess for the evening, and the jury returned with a unanimous verdict of guilty.
¶ 28. While Thornton relies on Isom for his contention that the rereading of the Sharplin instruction is prohibited, he fails to recognize this Court's distinction between the facts of Isom and Hardiman. In Hardiman, this Court explained:
The distinction between the case at bar and Isom is clear. The trial of this case lasted three days, twice the length of the trial in Isom, and the jury deliberated for approximately eight hours, about the same length of time as in Isom. None of the jurors expressed a desire to recess deliberations at any time before reaching a verdict. Consequently, under the facts and circumstances of the case at bar, we find that the trial judge acted well within his judicial discretion in allowing the jury to continue to deliberate.
Hardiman, 776 So.2d at 729 (¶ 27).
¶ 29. Consequently, based on Hardiman, this Court finds that under the circumstances of this case there was no error by the trial court in rereading the Sharplin instruction.
3. The Additional Intoxication Instruction and the Elements Instruction
¶ 30. Thornton also argues that the trial court erred when it gave an additional instruction on voluntary intoxication as a defense and reread the murder and manslaughter instructions. He argues that the court had already instructed the jury on intoxication and that it was error to re-instruct the jury on that matter. He further argues that rereading the murder and manslaughter instructions, which contained the elements of the charge, resulted in an impermissible highlighting of the elements.
¶ 31. Rule 3.10 of the Uniform Circuit and County Court Rules states:
If the jury, after they retire for deliberations, desires to be informed of any point of law, the court shall instruct the jury to reduce its question to writing and the court in its discretion, after affording the parties an opportunity to state their objections or assent, may *177 grant additional written instructions in response to the jury's request.
If it appears to the court that the jury has been unable to agree, the court may require the jury to continue their deliberations and may give an appropriate instruction.
¶ 32. Based upon the plain language of Rule 3.10, there is no doubt that a trial court has the authority to give supplemental instructions to a jury. The question then remains whether the instructions given by the trial court in this case were proper. That is the matter we next consider.
¶ 33. The original instruction on intoxication, which the trial court gave, reads:
The Court instructs the jury that voluntary intoxication is not a defense to a criminal act and therefore, if you believe from the evidence in this case beyond a reasonable doubt that the defendant was intoxicated at the time of the crime, and that this intoxication was voluntary on his part and if you further find beyond a reasonable doubt that the defendant committed the acts charged herein, then you are hereby instructed that intoxication is no defense to said acts.
The additional or supplemental instruction on intoxication given by the trial court was taken from Bailey v. State, 760 So.2d 781, 783 (¶ 6) (Miss.2000) and reads as follows:
The Court instructs the jury that if a defendant when sober is capable of distinguishing between right and wrong, and the defendant voluntarily deprived himself of the ability to distinguish between right and wrong by reason of becoming intoxicated and commits an offense while in that condition, he is criminally responsible for such acts.
¶ 34. As we have already observed, the trial judge reread the Sharplin instruction, which we have already discussed, gave the additional or supplemental instruction on intoxication, and reread the murder and manslaughter instructions. However, the trial judge, before sending the jury back for further deliberations, also cautioned the jury as follows:
Also, ladies and gentlemen, you are further reminded to read and take all of these instructions as a whole. Although the court has reread two instructions and is giving a new instruction, you are not to single out any one instruction over the others, and they are to be considered as a whole.
¶ 35. In regard to the appropriate standard of review for supplemental jury instructions, the Mississippi Supreme Court has stated: "Our inquiry, is not whether the circuit judge ruled contrary to what one of us might have ruled, not whether he was `right' or `wrong' in our view, but whether he abused his discretion. And, unless the trial court based its decision on an erroneous view of the law, we are not authorized to reverse for an abuse of discretion unless we find it was `arbitrary and clearly erroneous.'" Mickell v. State, 735 So.2d 1031, 1033 (¶ 7) (Miss.1999); Westbrook v. State, 658 So.2d 847, 851 (Miss. 1995), quoting Hooten v. State, 492 So.2d 948, 950 (Miss.1986).
¶ 36. In Sanders v. State, 586 So.2d 792, 796 (Miss.1991), our supreme court stated: "As a general proposition, the trial judge should not give undue prominence to particular portions of the evidence in the instructions." Miss.Code Ann. § 99-17-35 (Rev.2000); Mickell, 735 So.2d at 1033 (¶ 9) (citing Ragan v. State, 318 So.2d 879, 882 (Miss.1975)). "This prophylactic rule has the salutary purpose of protecting the jury from their natural inclination to put great weight in the judge's statements. To that end, this Court has held that instructions which emphasize any particular part of the testimony in such a manner as *178 to amount to a comment on the weight of that evidence are improper." Mickell, 735 So.2d at 1033 (¶ 9) (citing Duckworth v. State, 477 So.2d 935, 938 (Miss.1985)).
¶ 37. We do not find that the trial judge abused his discretion by giving the additional instruction on intoxication. It is obvious that the initial jury instruction did not make it clear to the jury as to the relevance of voluntary intoxication on the charges being considered. Here, it was appropriate for the judge to give the additional instruction on voluntary intoxication to guide the jury in making an informed and careful decision on Thornton's guilt. Also, we see no harm emanating from the trial judge's rereading the murder and manslaughter instructions in conjunction with the additional instruction on intoxication. It is a recognized presumption that the jury follows the instructions of the trial court. McCollum v. State, 785 So.2d 279, 283-84 (¶ 14) (Miss.2001) (citing Johnson v. State, 475 So.2d 1136, 1142 (Miss. 1985)). We see no reason to conclude that the jury did otherwise in this case.
¶ 38. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY OF CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HARRISON COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, THOMAS, LEE, MYERS, CHANDLER AND GRIFFIS, JJ., CONCUR.
NOTES
[1] The woman whom Shelton referred to was married to Thornton during the 1970s. The alleged affair had occurred during the same decade. She and Thornton divorced shortly thereafter.
[2] As will be discussed later in this opinion, the Mississippi Supreme Court, in Sharplin v. State, 330 So.2d 591, 596 (Miss.1976), approved an instruction which has come to be known as the Sharplin instruction. This instruction is set forth in full elsewhere in this opinion.